IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:19cr230-ECM-SRW |
| | ) | |
| JAREECE EDWARD BLACKMON | ) | |

## AMENDED REPORT AND RECOMMENDATION

This case is before the court on defendant's motion to suppress "the evidence found in a search of his residence on August 16, 2017, as well as any fruits of that evidence or statements made as a result of that unlawful search." Doc. 43 at 1. During an evidentiary hearing on the motion on May 28, 2020, defense counsel clarified that the only evidence defendant asks the court to suppress is "the duffel bag of marijuana" that was "found during the protective sweep." Doc. 103 at 79. For the reasons discussed below, the court concludes that the motion to suppress is due to be denied.

### Facts

The charges against defendant stem from an August 16, 2017 search of an apartment located at 819 East Lee Street, Enterprise, Alabama. According to Matthew Saxon, an officer with the Enterprise Police Department who has been employed for the last 13 years as an investigator, the incident began with the shooting of Carl Sewell the day before on August 15, 2017. On that date, Saxon was called to Sherwin Street in Enterprise, the scene of the shooting. According to Saxon, the lead detective investigating Sewell's shooting, there were three eyewitnesses on the scene. Each of them picked defendant Blackmon out of a lineup as having been involved in the shooting. Additionally, Saxon confirmed with

"another subject [who] was with [defendant] during the incident" that defendant was present at the shooting. According to Saxon, the eyewitnesses said that they saw defendant and Sewell, who was carrying a duffel bag, enter a residence that belonged to neither of them. The witnesses said they heard gunshots and, thereafter, Sewell stepped out of the house and called police, but later died. Saxon testified that one or more of the witnesses said that the duffel bag contained "cash for a car." However, Saxon later learned through his investigation that the bag held marijuana and that defendant had met Sewell "for a drug deal." Officers searched the residence where Sewell had been shot, but did not find the duffel bag, marijuana, or any physical evidence.

Saxon testified that on the following day – August 16, 2017 – officers went to 819 East Lee Street, Apartment 1, Enterprise, Alabama, because they believed defendant may be there as the apartment was listed as his last known address for probation purposes. Additionally, a few weeks earlier, officers had visited that address, which defendant had provided to them, in relation to a "domestic issue." Moreover, a vehicle that the officers believed to be defendant's – as that vehicle had been the subject of his domestic complaint – was parked outside the apartment.

After arriving at the apartment, the officers knocked on the door, announced themselves, and "just tried to get anyone to answer the door." Although detectives "observed someone through the blinds" whom they could not identify, no one came to the door. Officers remained on the property for "approximately five hours" with no success. During this time, officers saw shoes outside the door which "appeared to have blood on them."

After the failed attempt to get someone to answer the door at the apartment they believed to be defendant's, Saxon applied for a search warrant "to enter the apartment to search and retrieve" defendant." The warrant application reads as follows:

> [M]y name is Matthew Saxon. I am currently employed with the Enterprise Police Department assigned to the position of Detective. I have been in law enforcement for approximately eight years. I have attended numerous classes pertaining to investigations to include: Crime Scene Processing, Interviews and Interrigations [sic], Traffic Homicide Investigations, Proactive Criminal Patrol, Homicide Investigations, First Line Supervision and Management, and others.

> On August 15, 2017, Officers [sic] Hodiwala and Sergeant Mcdonald were dispatched to the area of Coppinville Road for a shooting. Officers Amber Darbro, Luigi Raggazonni, and Lieutenant Anderson also responded. The caller was unable to give an accurate location of the shooting. Officers were able to locate the victim, Carl Sewell, at 205 Sherwin Street, Enterprise, Alabama. Upon arrival Officers found a heavy set black male sitting on the ground and propped up on a beam. Officer Hodiwala observed that the victim had multiple gunshot wounds to his upper torso and arm. While Sergeant MacDonald tended to the victim, Officer Hodiwala and Officer Ragazzoni entered the residence to conduct a safety sweep. When Officer Hodiwala and Officer Ragazzoni entered the kitchen they found blood on the floor and several shell casings; the back door was also partially open. No other individuals were located inside the residence. Officers located two vehicles (Kia Forte AL tag: 2BR6259 & Chevy Malibu AL tag: 2BV9721) with individuals possibly linked to the shooting. Officers also located another witness identified as Willie Coleman. While Officers were securing the scene the home owner of 205 Sherwin Street arrived, Katrice Nelson. She was unaware of what had transpired and was not there at the time of the shooting. She advised that no one was supposed to have been at her residence. The homeowner was congregating with some of her neighbors and mentioned that she was concerned about her dog running loose. Coleman mentioned that the dog may have run out through the open door located in the kitchen. The home owner then asked him how he knew about the open door if he was not involved in the incident; Coleman stated that an officer told him. When the homeowner asked which one, Coleman was unable to answer her. Detective Saxon, Detective Bomhard, Detective Sweeney & Lieutenant Griswold also responded and processed the scene. Sewell was transported to Medical Center Enterprise; [sic] where he was pronounced dead at the hospital.

The victim, Carl Sewell, and three other subjects drove from Mobile, Alabama with intent to buy a vehicle from a person known to them as "Dee" or "D", later identified as Jareece Edward Blackmon. The witnesses are Cedric Moultrie, Ashley Hicks, and Ashley Mosner. Sewell and Monser traveled in a tan color Chevrolet Malibu owned by Mosner. Moultrie and his girlfriend, Hicks, were traveling in a silver Kia Forte owned by Hicks. They arrived at approximately 1500 hours but were unable to make contact with Blackmon, so they waited at the Enterprise Sports Complex. They waited there until they decided to go to Ruby Tuesdays [sic] for dinner. They first stopped by Walmart so Sewell could pick up money that his wife had wired to him. Once the money was obtained they went and had dinner at Ruby Tuesdays [sic]. While at Ruby Tuesdays [sic], Blackmon finally made contact with Sewell and advised him to meet him at Walmart. They left Ruby Tuesdays [sic] and met with Blackmon, who was driving a silver 2004 Hyundai Elantra (AL tag: 2LS52) that is registered to a Brenda Spikes. Willie Coleman was also present with Blackmon. Blackmon advised them to follow him to 205 Sherwin Street so they could complete the transaction. Moultrie, Hicks, and Mosner were not comfortable with the arrangement so they allowed Sewell to drive the Kia Forte alone and follow Blackmon. Moultrie, Hicks, and Mosner ended up following Sewell and parked in front of 205 Sherwin Street. Sewell entered the residence with a large duffel bag that they said had money for the vehicle, but through the investigation it is believed to have been filled with marijuana. Blackmon and Sewell were inside the residence while Coleman waited on the front porch and the others in the Chevrolet Malibu parked in front. All subjects heard numerous gunshots come from inside the residence, causing the subjects to flee the area. Sewell exited the front door and called the Enterprise Police Department and stated that he had been shot. Moultrie also called the Enterprise Police Department to report that shots had been fired. Due to the fact that the subjects were from Mobile, they were unable to give a location. Officers arrived and found Sewell in the front yard and also made contact with the witnesses. The vehicle that Blackmon drove to 205 Sherwin Street was still parked in front of the residence. The vehicle was towed to a secure location.

On August 16, 2017, at approximately 0830 hours, Detective Saxon obtained an arrest warrant for Blackmon. At approximately 1000 hours, detectives with the Enterprise Police Department went to the last known address, 819 East Lee Street, Apartment 1, Enterprise, Alabama, in attempt [sic] to locate Blackmon. Blackmon is on probation through the Coffee County Pardons and Paroles and the address listed is 819 East Lee Street, Apartment 1. As of May 30, 2017, Blackmon was involved in a domestic violence incident at this address where his girlfriend damaged his car, a red 1998 Ford Crown Victoria. Blackmon filed a report with the Enterprise

Police Department and had 819 East Lee Street, Apartment 1 as his home address. The vehicle that he reported damage to is currently parked outside of the apartment. Detectives knocked on the door of apartment one and received no answer. Detective Sweeney and Detective Dube observed a subject moved [sic] the blinds and look out of the window. It was unknown if it was Blackmon, but the subject refuses to answer the door. While detective [sic] were on scene [sic], Sergeant Hale observed a brown pair of men's shoes at the rear corner of apartment 1. The shoes appeared to have fresh blood stains on them. Detectives have been attempting to have verbal communications with someone inside in attempt to have them exit. At this time no one has exited the residence or made contact with anyone.

Therefore, I have probable cause to believe and do believe that Jareece Blackmon was involved in committing the crime of murder and is barricaded inside 819 East Lee Street, apartment 1. I ask that a search warrant be authorized to allow Detective Matthew Saxon, and any other officers he designates to assist, to conduct a search of the [sic] 819 East Lee Street, apartment 1, Enterprise, AL to locate Jareece Blackmon that has an arrest warrant for Murder. 819 East Lee Street, apartment 1, Enterprise, AL. From the Enterprise Police Department travel north on Main Street, make a right turn on East Lee Street and 819 East Lee Street will be on the left. The apartment building is a two story apartment complex that faces East Lee Street, Enterprise, Alabama. Apartment 1 is located on the lower level, farthest apartment on the left facing the apartments. The front door of the apartment clearly has number 1 on the door. The requested evidence is relevant, material and necessary to conduct a proper investigation.

Gov. Ex. 1. Coffee County District Judge Chris Kaminski signed and issued the warrant.

Saxon also discussed with Judge Kaminski the possibility of getting a second search

warrant to search the apartment for evidence related to the shooting. Judge Kaminski told

Saxon that he would agree to sign that search warrant if the officers found defendant in the

apartment.

According to Saxon, when he applied for the warrant, his office had already notified

the Dothan Police Department's SWAT team of the situation. By the time the warrant was

signed, the SWAT team, which consisted of "probably six to eight" officers, had arrived.

Once they received word of the warrant, they entered the apartment. Eight to 10 more officers remained outside.

Officer Justin Dodson, who has been employed by the Dothan Police Department for 14 years and has been a member of the SWAT team for 12 years, was part of the team that executed the search warrant. His job was to "help breach the door … to the residence as well as make entry to find the suspect." The officers approached the front of the apartment, which had a large window – probably three to four feet wide and three to four feet high – and used a battering ram to breach the front door. They found a man in the den alone. Dodson knew that this man was the defendant because he and the other SWAT team members had been briefed on defendant's background and had been given a picture of defendant. They were also told that defendant was a homicide suspect. Dodson testified that his team members believed that defendant would be armed with the weapon he used to commit the murder and possibly more. Dodson testified that he was not told about or asked to search for a duffel bag. His mission was to find the defendant.

 Dodson testified that the officer who led with a shield gave defendant "multiple commands[,] over and over" – e.g., "Get on the ground, lay on your stomach, put your hands out, cross your ankles" – and that defendant did not comply. Dodson said that despite the officers' using a "[f]lashbang diversionary devic[e]"[1] to distract defendant, and three or four officers' pointing automatic weapons at him, defendant disregarded the commands and refused to comply. According to Dodson, defendant would start to get down in

---

[1] Dobson testified that this is an incendiary device that creates a bright light and loud bang.

response to commands, but then he would get up or move. Defendant also repeatedly reached under a piece of furniture in the den into an area that the officers could not see.

Dodson then walked to the large front window and used a "Halligan tool" to rip out the window in order to give the other officers a clear view, as only a few officers could fit in the "small area of the front door." Dodson also wanted to "put more guns into the room." Dodson explained that without the window in the way, the officers had a better view of defendant. Moreover, this eliminated the risk associated with putting officers in the room, especially if defendant, who continued to reach into a place they could not see, was readying a weapon. Once Dodson took out the window, the officers pointed more guns at defendant and activated another flashbang device. At that point, defendant put his hands on his head and complied with the command to surrender. The officers told defendant to crawl on his belly backwards to the door, where he was handcuffed and taken away. With defendant outside, the officers began shouting commands into the apartment – e.g., "If anyone else is here, show yourself now"; "Dothan Police Department, SWAT team, search warrant"; "If you're here, show yourself."

Dodson testified that once he took out the window, he could see down the hallway to the back of the "no more than 1,000 square foot, maybe 1,100 at the most" apartment, which had a den,[2] a kitchen, a bathroom, a storage closet, and a bedroom with a standard closet. Dodson testified that the kitchen is to the left of the hallway. Next on the left is a door to a bathroom. A door off to the right opens to a closet. Finally, the "very back room"

---

[2] At some points during the hearing, counsel referred to this as the "living room." For the sake of consistency, court uses the term "den" throughout this recommendation.

at the end of the hallway is the bedroom. There are sliding glass doors – outfitted with vertical blinds – in the bedroom. Those doors face outside the back of the apartment, where more SWAT team members were stationed. Dodson could not see into the bedroom from his vantage point at the front of the apartment. Ultimately, two other people emerged from the bedroom in response to the officers' commands and surrendered to the officers who were at the front of the apartment.

The SWAT team members who were standing outside the back of the apartment could not see into the bedroom. However, those officers told the officers in the front that they saw the vertical blinds in the bedroom "continually moving" even after the other two individuals exited the home, and believed that someone was in there who had not yet come out. According to Dodson, this report also "made [the officers in the front] believe that there was yet another person in the apartment that had not surrendered or come to us."

The officers in the front released a robot – "a wheeled device that has live video" – into the apartment. The robot relayed images of "the majority of the apartment," but "not all of it because there were some closed doors in there that the robot obviously [could not] open[.]" Accordingly, Dodson testified, the officers assembled an entry team and went inside the apartment again. The purpose of this entry was to "clear [the apartment] of any and all threats" prior to the investigators' arrival and to look for a "fourth suspect" based on the observations of the officers watching the blinds on the sliding glass doors.

The entry team first went to the den and cleared the "couch area." There was no threat, so they moved down the hallway. The first room they reached was the kitchen, located off the left side of the hallway. Dodson and one other officer – Cade Wells – entered

the "narrow, small kitchen that went to a wall maybe eight f[ee]t straight ahead." There was a refrigerator in the kitchen that was "slightly canted back from the wall in a counterclockwise direction." Dodson explained, "[I]f you took the handle up on the freezer and moved it in a counterclockwise direction, it was sitting somewhat of an angle off the wall, enough that you could put a human behind it." Dodson estimated that the refrigerator was about a foot and half to two feet away from the wall.

Dodson testified that Wells pointed a gun toward the refrigerator and nodded, which Dodson understood to mean that they needed to "clear it." Dodson explained, "I would have been facing more of the front … and [Wells] would have been seeing the side. [The refrigerator] was turned with the handle facing in, say, the 3:00 to 4:00 position, and I grabbed and pulled it directly in that direction, and then my partner was able to see directly down and behind it. [Wells] walked up a step, maybe two, to see that we [were] clear behind it, and we left. So, I would have been seeing more of the front and he more of the side, but we both were really seeing the same thing as small as it was, but that's the angle that it was sitting when we entered the kitchen." According to Dodson, someone "absolutely" could have hidden behind the refrigerator "or … could have moved it, got[ten] behind it, and moved it back to that position[.]" Dodson testified that there was enough space for "any adult male to be hiding behind."

Additionally, Dodson testified that in his years of experience with the SWAT team executing search warrants, he had found people hiding in even more unusual spots than behind a refrigerator, including in a pile of dirty laundry, a bathtub, and inside bottom cabinets in kitchens and bathrooms. So, with this knowledge, Dodson grabbed the only

available handle – the top handle to the freezer – and pulled the refrigerator toward him with a "violen[]t, jerking action[.]" This allowed Wells to see behind the refrigerator and confirm that no one was hiding behind it.

However, when Dodson pulled the freezer handle, what he referred to as a "gym bag" fell out of the freezer and onto his foot. Dodson testified that because it was late summer and very hot and there was no air conditioning in the house, "the smell of cannabis" diffusing from the bag was "breathtaking." According to Dodson, the smell was "so strong that [he and Wells] couldn't breathe." Dodson did not open the bag but, instead, picked it up and threw it with his right hand to his right, toward the open window in the den. Due to its weight, the bag fell short of the open window. Dodson testified that he threw the bag into the other room to "remove it from [his and Wells' presence] so that [they] could have free air." Dodson testified that he was not aware of any other officer's having opened the bag during the protective sweep.

Dodson and Wells then rejoined the team, who had made it to the back of the apartment. The team cleared the bathroom to the left of the hallway, the bedroom in the back – where they discovered that the blinds were moving due to an oscillating fan – and the closet off the right of the hallway. Once they cleared these rooms, the officers worked their way back out of the apartment and left.

With defendant in custody, Enterprise Police Department officer Evan Sweeney signed an affidavit for a search warrant for "items [defendant] used in the commission of the murder, to include but not limited to, firearms, ammunition, clothing, duffel bags, cell

phones, and any items that appear to have blood on them that may still be at the residence."

Gov. Ex. 2. The warrant application reads as follows:

I am Detective Evan Sweeney, a detective with the Enterprise Police Department. I have been employed with the Enterprise Police Department for approximately seven years and have spent the last three years as a detective assigned to the Criminal Investigations Division. I have attended numerous classes in which I was trained to respond to and secure crime scenes, conduct death and homicide investigations, as well as interview and interrogation of victims and suspects [sic]." Additionally, I have received training in the processing of crimes [sic] scenes, which included documenting the complete crime scene and handling of evidence. The training included documentation of the crime scenes included [sic] photographing and video recording the crime scene to its entirety as well as making written and audio recorded notes of the scene. My training in handling evidence has included the proper processing, collecting, packaging, documenting, and submission of evidence. During my time assigned to the Criminal Investigations Division, I have worked numerous cases in which I have put my training to use. I have responded to many crime scenes in which I was tasked with documenting the crime scene and handling the evidence of the crime scenes.

On August 15, 2017, Officers [sic] Hodiwala and Sergeant Mcdonald were dispatched to the area of Coppinville Road for a shooting. Officers Amber Darbro, Luigi Raggazonni, and Lieutenant Anderson also responded. The caller was unable to give an accurate location of the shooting. Officers were able to locate the victim, Carl Sewell, at 205 Sherwin Street, Enterprise, Alabama. Upon arrival Officers found a heavy set black male sitting on the ground and propped up on a beam. Officer Hodiwala observed that the victim had multiple gunshot wounds to his upper torso and arm. While Sergeant MacDonald tended to the victim, Officer Hodiwala and Officer Ragazzoni entered the residence to conduct a safety sweep. When Officer Hodiwala and Officer Ragazzoni entered the kitchen they found blood on the floor and several shell casings; the back door was also partially open. No other individuals were located inside the residence. Officers located two vehicles (Kia Forte AL tag: 2BR6259 & Chevy Malibu AL tag: 2BV9721) with individuals possibly linked to the shooting. Officers also located another witness identified as Willie Coleman. While Officers were securing the scene the home owner of 205 Sherwin Street arrived, Katrice Nelson. She was unaware of what had transpired and was not there at the time of the shooting. She advised that no one was supposed to have been at her residence. The homeowner was congregating with some of her neighbors and mentioned

that she was concerned about her dog running loose. Coleman mentioned that the dog may have run out through the open door located in the kitchen. The home owner then asked him how he knew about the open door if he was not involved in the incident; Coleman stated that an officer told him. When the homeowner asked which one, Coleman was unable to answer her. Detective Saxon, Detective Bomhard, Detective Sweeney & Lieutenant Griswold also responded and processed the scene. Sewell was transported to Medical Center Enterprise; [sic] where he was pronounced dead at the hospital.

The victim, Carl Sewell, and three other subjects drove from Mobile, Alabama with intent to buy a vehicle from a person known to them as "Dee" or "D", later identified as Jareece Edward Blackmon. The witnesses are Cedric Moultrie, Ashley Hicks, and Ashley Mosner. Sewell and Monser traveled in a tan color Chevrolet Malibu owned by Mosner. Moultrie and his girlfriend, Hicks, were traveling in a silver Kia Forte owned by Hicks. They arrived at approximately 1500 hours but were unable to make contact with Blackmon, so they waited at the Enterprise Sports Complex. They waited there until they decided to go to Ruby Tuesdays [sic] for dinner. They first stopped by Walmart so Sewell could pick up money that his wife had wired to him. Once the money was obtained they went and had dinner at Ruby Tuesdays [sic]. While at Ruby Tuesdays [sic], Blackmon finally made contact with Sewell and advised him to meet him at Walmart. They left Ruby Tuesdays [sic] and met with Blackmon, who was driving a silver 2004 Hyundai Elantra (AL tag: 2LS52) that is registered to a Brenda Spikes. Willie Coleman was also present with Blackmon. Blackmon advised them to follow him to 205 Sherwin Street so they could complete the transaction. Moultrie, Hicks, and Mosner were not comfortable with the arrangement so they allowed Sewell to drive the Kia Forte alone and follow Blackmon. Moultrie, Hicks, and Mosner ended up following Sewell and parked in front of 205 Sherwin Street. Sewell entered the residence with a large duffel bag that they said had money for the vehicle, but through the investigation it is believed to have been filled with marijuana. Blackmon and Sewell were inside the residence while Coleman waited on the front porch and the others in the Chevrolet Malibu parked in front. All subjects heard numerous gunshots come from inside the residence, causing the subjects to flee the area. Sewell exited the front door and called the Enterprise Police Department and stated that he had been shot. Moultrie also called the Enterprise Police Department to report that shots had been fired. Due to the fact that the subjects were from Mobile, they were unable to give a location. Officers arrived and found Sewell in the front yard and also made contact with the witnesses. The vehicle that Blackmon drove to 205 Sherwin Street was still parked in front of the residence. The vehicle was towed to a secure location.

On August 16, 2017, at approximately 0830 hours, Detective Saxon obtained an arrest warrant for Blackmon. At approximately 1000 hours, detectives with the Enterprise Police Department went to the last known address, 819 East Lee Street, Apartment 1, Enterprise, Alabama, in attempt [sic] to locate Blackmon. Blackmon is on probation through the Coffee County Pardons and Paroles and the address listed is 819 East Lee Street, Apartment 1. As of May 30, 2017, Blackmon was involved in a domestic violence incident at this address where his girlfriend damaged his car, a red 1998 Ford Crown Victoria. Blackmon filed a report with the Enterprise Police Department and had 819 East Lee Street, Apartment 1 as his home address. The vehicle that he reported damage to is currently parked outside of the apartment. Detectives knocked on the door of apartment one and received no answer. Detective Sweeney and Detective Dube observed a subject moved [sic] the blinds and look out of the window. It was unknown it if was Blackmon, but the subject refuses to answer the door. While detective [sic] were on scene [sic], Sergeant Hale observed a brown pair of men's shoes at the rear corner of apartment 1. The shoes appeared to have fresh blood stains on them. Detectives have been attempting to have verbal communications with someone inside in attempt to have them exit. Since no one would come to the door[,] Detective Saxon completed a search warrant to conduct a search for Jareece Blackmon at the residence.

On August 16, 2017, a search warrant was granted to Detective Saxon to search the residence for Jareece Blackmon and officers with the Enterprise Police Department and the US Marshalls kept the residence under surveillance until the Dothan SWAT team arrived. Officers again tried to make contact the occupants [sic] but no one would acknowledge them. The search warrant was executed and the SWAT made entry and secured the residence. Jaminson Blackmon, [sic] Delicia Sweet were inside the residence and taken into custody. Since Jareece Blackmon was in the residence and refused to surrender until the SWAT team made entry, I have probable cause to believe and do believe that items Jarecce [sic] Blackmon used in the commission of the murder to include but not limited to, firearms, ammunition, clothing, duffel bags, cell phones, and any items that appear to have blood on them that may still be at the residence. I asked for a search warrant to be issued to recover those items. I ask that a search warrant be authorized to allow Detective Evan Sweeney, and any other officers he designates to assist, to conduct a search of the [sic] 819 East Lee, apartment 1, Enterprise, AL to search for evidence for Murder. 819 East Lee Street, apartment 1, Enterprise, AL. From the Enterprise Police Department travel north on Main Street, make a right turn on East Lee Street and 819 East Lee Street will be on the left. The apartment building is a two story apartment complex that faces East Lee Street, Enterprise, Alabama. Apartment 1 is

located on the lower level, farthest apartment on the left facing the apartments. The front door of the apartment clearly has number 1 on the door. The requested evidence is relevant, material and necessary to conduct a proper investigation.

Gov. Ex. 2. Coffee County District Judge Chris Kaminski signed and issued the warrant, as he had the first. Sweeney testified at the suppression hearing that he was not aware that during the protective sweep officers had smelled marijuana emanating from the duffel bag. However, because the pre-search investigation had led the officers to believe the duffel bag that eyewitnesses had seen at the shooting contained marijuana, and that defendant had taken the duffel bag, Sweeney included "duffel bags" in the list of items they proposed to search for. Sweeney also testified that his department considered the duffel bag, which they believed had been taken during the shooting, to have evidentiary value, and that, in addition to marijuana, the bag could have contained a firearm.

Officers executed the second search warrant and, during the course of this search, opened the duffel bag and found 20 pounds of marijuana. They also found a suitcase with a gun magazine and a gun, as well as a handgun.[3]

**Discussion**

### 1. Confessions and statements

Defense counsel made clear in the evidentiary hearing that defendant seeks to suppress only the duffel bag found during the protective sweep. However, because

---

[3] It is not entirely clear from the testimony elicited at the hearing, but it seems the officers may have also recovered a second handgun, found in a baby's bassinet. However, as noted above, defendant only seeks to suppress the duffel bag of marijuana that was found during the protective sweep.

defendant raised the issue of statements in his motion, the court notes that defendant did not actually identify in his motion any confessions or statements proposed for suppression by the court, or offer any facts or argument relating to such statements. The court cannot recommend suppression of statements that either do not exist or, if they do, were not specifically brought to its attention. *See United States v. Porter*, 2018 WL 4214189, at *11 (M.D. Ala. 2018) (statements were not required to be suppressed where defendant did not advise the court – through his motion or argument at the suppression hearing – what the statements were that he wished to have suppressed; no testimony was provided at the hearing as to the contents of the statements, when and to whom the statements were made, how much time elapsed between the seizure of the evidence and the statements, whether defendant was in custody at the time he made the statements, and whether the statements were even incriminating in the first place; and defendant offered no argument whatsoever as to why the statements should be considered the "fruit of the poisonous tree" or whether they somehow stood alone.). *See also United States v. Edwards*, 563 F. Supp. 2d 977, 994 (D. Minn. 2008) ("At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed."); *United States v. Diezel*, 608 F.2d 204, 207(5th Cir. 1979) ("As this Court said in *United States v. Evans*, ... 'The burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the court that the evidence should be suppressed.'") (citation omitted); *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("It is well

established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing.").

### 2. Other evidence

#### a. Valid search warrants

The physical evidence that defendant seeks to suppress – *i.e.*, the duffel bag containing 20 pounds of marijuana – was secured by the government through the execution of two search warrants. The first warrant – for the search of "819 East Lee Street, apartment 1, Enterprise, AL to locate Jareece Blackmon[, who] has an arrest warrant for [m]urder" – was signed on August 16, 2017 by Coffee County District Court Judge Chris Kaminski. During the execution of the first warrant, officers conducted a protective sweep of the apartment and found the duffel bag. The second warrant – for "items [defendant] used in the commission of the murder, to include but not limited to, firearms, ammunition, clothing, duffel bags, cell phones, and any items that appear to have blood on them that may still be at the residence" – was signed by Judge Kaminski later that same day. During this second search, the officers opened the duffel bag and discovered marijuana.

Defendant characterizes his motion as containing two bases for the court's holding a *Franks* hearing. The first is that "*if* Officer Sweeney[, the affiant for the second search warrant] told Judge Kaminski about the discovery of the duffel bag and it influenced [him] to grant the second search warrant for the residence, then the second search warrant is fruit of the poisonous tree." (emphasis supplied). The second is "*if*, in the alternative, Officer Sweeney[] intentionally or recklessly omitted the discovery of the black duffel bag from the warrant affidavit, *perhaps* believing or knowing that the Enterprise Police Department

had illegally searched the refrigerator, then the [c]ourt should also suppress the drug evidence in this case. The [judge] was deprived of all information to make a probable cause finding, including whether evidence was obtained in violation of the Fourth Amendment." In his motion, defendant requests a *Franks* hearing. Doc. 43 at 5-8.

The Supreme Court has made it clear that "[t]here is ... a presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684.

> In *Franks*, the Supreme Court held the Fourth Amendment requires a district court to hold a hearing when a defendant makes a substantial preliminary showing that: (1) a warrant affiant made intentionally false or recklessly misleading statements (or omissions); and (2) those statements, or omissions, were necessary to the finding of probable cause. 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The defendant must (1) allege deliberate falsehood or reckless disregard for the truth; (2) specifically point to the allegedly false portions of the warrant affidavit; and (3) provide an offer of proof, including sworn affidavits or otherwise reliable witness statements, or satisfactorily explain the absence of such evidence. *Id.* at 171, 98 S.Ct. 2674. If, upon such a showing, the content in the affidavit remains sufficient to support a finding of probable cause, then no hearing is required. *Id.* at 171–72, 98 S.Ct. 2674.

*United States v. Ward*, 732 F. App'x 861, 862 (11th Cir. 2018). Defendant fails to meet this standard.

In support of his motion, defendant refers the court to Officer Sweeney's sworn testimony during defendant's preliminary hearing. During that hearing, Officer Sweeney testified as follows:

> **AUSA Kevin Davidson**: Now, at some point was another search warrant obtained?
>
> **Sweeney**: Yes, Sir.

> **Sweeney**: I obtained the search warrant.
>
> **AUSA Kevin Davidson**: What was the reason that you went to get another search warrant?
>
> **Sweeney**: Since Blackmon was in the residence and we were looking for items related to what had happened the previous evening, and we knew that they had recovered – they had told us that when they were cleaning the house, they found the marijuana. We felt like the items related to that crime were still in the residence.

Doc. 21 at pp. 8-9. This is the only preliminary showing based on sworn testimony actually offered by defendant's motion concerning an alleged omission.

Despite defendant's characterizing his motion as containing two grounds for holding a *Franks* hearing, his argument actually seems to be three-fold. The first part receives the least attention in the motion. Defendant maintains that Officer Sweeney's affidavit "does not list details know[n] by the [o]fficers that form a substantial basis for concluding that evidence would be found in the apartment." Defendant suggests that "[i]t is possible … that Officer Sweeney verbally informed Judge Kaminski that Enterprise Police Department found the black duffel bag during the protective sweep and that this information induced the Magistrate to issue a warrant." Doc. 43 at 5. Defendant argues that "[i]f this is the case, then the second warrant is fruit of the poisonous tree and it must be suppressed." *Id*. However, defendant has made no preliminary showing that Sweeney orally informed Judge Kaminski of anything, so this argument fails.

Second, defendant contends that Officer Sweeney knew that the duffel bag contained marijuana and that his intentional or reckless omission of this fact in the affidavit for the second warrant violated the Fourth Amendment. *See* Doc. 43 at 7 (Sweeney "[k]new

or believed that discovery of the marijuana was the strongest piece of evidence that would lead a magistrate to believe that other instruments of the crime would be found in the apartment and yet he omitted the discovery of the marijuana from the second warrant affidavit to search the residence and to recover a 'duffel bag.'"). However, defendant does not explain how this alleged omission might have rendered the affidavit invalid. On the contrary, had the fact that a duffel bag containing marijuana had been found in defendant's apartment been included in the affidavit, Judge Kaminski would have had even more information to support his finding that there was probable cause to issue the second warrant.

Finally, defendant vaguely suggests that Officer Sweeney omitted the discovery of the duffel bag of marijuana to cover up the searching officers' having opened the duffel bag during the protective sweep – prior to their obtaining the second warrant – which he contends would have been a Fourth Amendment violation. *See* Doc. 43 at 6 ("[T]he information that the Officers omitted[] may have resulted in a Magistrate finding that the scope of the protective sweep had been exceeded, the Fourth Amendment violated, and a warrant to retrieve the tainted evidence not being granted."); *id*. at 7, n. 1 ("It is interesting to note that Officer Sweeney testified that they had found the marijuana prior to obtaining the second warrant, when allegedly the duffel bag was not opened until after the second warrant was issued."). However, nothing in Sweeney's sworn testimony at defendant's preliminary hearing establishes that officers actually did open the duffel bag during the protective sweep, or that they otherwise exceeded the scope of the protective sweep, so this argument also fails.

Further, even assuming, for the sake of argument, that defendant's motion made a substantial preliminary showing under *Franks* that Sweeney intentionally or recklessly misled Judge Kaminski by omitting from the affidavit facts relating to the discovery of the duffel bag containing marijuana, the motion still would fail, as defendant has not made a substantial preliminary showing that inclusion of the omitted facts would have prevented a finding of probable cause. *See Madiwale v. Savaiko*, 117 F. 3d 1321, 1326-27 (11th Cir. 1997) ("[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause.").

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. In issuing a warrant, a judge is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quotation omitted); *see also United States v. Jiminez,* 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting *Gates,* 462 U.S. at 238). The court must find only that the judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant. *See Gates,* 462 U.S. at 238; *see also Massachusetts v. Upton,* 466 U.S. 727, 728 (1984). The validity of the warrant is reviewed based on the totality of the circumstances. *See United States v. Brundidge,* 170 F.3d 1350, 1352 (11th Cir.1999). "'[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'" *Id.* (quoting *Gates,* 462 U.S. at 232).

"Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determination." *United States v. Miller,* 24 F.3d 1357, 1361 (11th Cir.1994). Suppression of evidence is only required where the affidavit supporting the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975). "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Upton*, 466 U.S. at 734 (citation and internal quotation marks omitted).

In this case, Judge Kaminski clearly had a "substantial basis" for concluding that probable cause existed to issue the warrant, even if the only allegedly omitted facts shown by proffer through Sweeney's testimony at the preliminary hearing – that the officers discovered a duffel bag of marijuana during the protective sweep – had been included in the warrant affidavit. Sweeney offered a sworn affidavit to Judge Kaminski establishing that defendant had been involved in a shooting that resulted in a death, that defendant had been located at an address that he held out to be his own, and that there were shoes outside the address that appeared to the officers to be stained with blood.[4] It was wholly reasonable for Judge Kaminski to believe, based on the affidavit before him, that evidence of the shooting, even apart from the duffel bag – *e.g.*, firearms and DNA evidence – may be

---

[4] The shoes later were found not to have any bloodstains on them.

located in the apartment. Because the court cannot determine that inclusion of the information allegedly omitted would have vitiated probable cause, this argument fails and defendant is not entitled to *Franks*-specific hearing.

Additionally, to the extent that a *Franks* hearing was the relief requested for the alleged violation, the court held an evidentiary hearing on the motion to suppress and defense counsel had the opportunity to cross-examine Sweeney regarding the affidavits.

### b. *Valid protective sweep*

Defendant also argues the officers exceeded the scope of the protective sweep by searching the refrigerator. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *United States v. Bennett,* 555 F.3d 962, 965 (11th Cir. 2009). However, "[t]o protect their safety while making*, and after*, an arrest, law enforcement officers may also perform a 'protective sweep' of the residence. … A protective sweep is an exception to the general requirement that officers need exigent circumstances and probable cause, or a search warrant, to conduct a search of a person's home." *Williams*, 871 F.3d at 1201 (citations and some internal quotation marks omitted) (emphasis added). The Supreme Court has permitted officers to undertake protective sweeps in such instances "because of the compelling interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack, acknowledging that analogous intrusions were limited to nothing more than necessary to protect the officer from harm." *United States v. Medina*,

631 F. App'x 682, 684 (11th Cir. 2015) (citations and internal quotation marks omitted); *see also United States v. Hromada*, 49 F.3d 685, 690 n. 9 (11th Cir. 1995) ("the dangers presented by in-home arrests are often greater than those conducted on the street due to the 'home turf' advantage the suspect has over the police.").

"A protective sweep involves only a cursory inspection of those spaces where a person may be found and ends when the reasonable suspicion of danger is dispelled. … In conducting a protective sweep, officers are permitted to look in closets and other spaces immediately adjoining the place of arrest – with or without probable cause or reasonable suspicion – because the threat of danger is greatest there." *Id.* (citations and internal quotation marks omitted). "To search more removed areas of the residence, however, officers must have at least a reasonable suspicion of the presence of dangerous individuals. … That is, there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 1201-02 (citation and internal quotation marks omitted). The sweep should last "no longer than necessary to dispel the reasonable suspicion of danger and may extend only to those places where a person might be found." *United States v. Davis*, 153 F. App'x 670, 672 (11th Cir. 2005)(citations omitted).

Several courts have interpreted *Buie* to recognize two types of protective sweeps. *See, e.g., United States v. Archibald*, 589 F.3d 289, 295 (6th Cir. 2009); *United States v. Thomas*, 429 F. 3d 282, 287 (D.C. Cir. 2005), *on reh'g in part*, 179 F. App'x 60 (D.C. Cir. 2006); *United States v. Dabrezil*, 2013 WL 11327706, at *11 (S.D. Fla. 2013), *report and*

*recommendation adopted*, No. 13-20765, 2013 WL 11328381 (S.D. Fla. 2013), *aff'd*, 603 F. App'x 756 (11th Cir. 2015); *United States v. Sunkett*, 95 F. Supp. 2d 1367, 1372 (N.D. Ga. 2000); *United States v. Mayo*, 792 F. Supp. 768, 773 (M.D. Ala. 1992). "The first may be conducted 'as a precautionary matter' and without probable cause or reasonable suspicion, but it must be limited to 'spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'" *Thomas*, 429 at 287 (citing *Buie*, 494 U.S. at 334, 110 S.Ct. 1093). "The second may extend beyond immediately adjoining spaces but must be based upon 'articulable facts which ... would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Id.*

In the case at bar, the court concludes that the task force officers' search of defendant's home was a valid protective sweep under both the first and second *Buie* criteria. This is so for two reasons. First, defendant was arrested in the den, which essentially adjoins the kitchen in an apartment that measures, at most, 1,100 square feet. The refrigerator was only approximately eight feet from the threshold of the kitchen. Additionally, one could stand outside the front window and see all the way to the back bedroom. Under these specific circumstances, the entire apartment can reasonably be described as an area immediately adjacent to the location of the arrest from which an attack could have been launched. *See Thomas*, 429 F.3d at 287–88 ("If an apartment is small enough that all of it 'immediately adjoin[s] the place of arrest' and all of it constitutes a space or spaces 'from which an attack could be immediately launched, ... then the entire apartment is subject to a limited sweep of spaces where a person may be found.") (citation

omitted); *United States v. Redrick*, 48 F. Supp. 3d 91, 99–100 (D.D.C. 2014) ("apartment was small enough that the entirety of the apartment, including the closet, could be searched as part of a legitimate first type of *Buie* search."); *United States v. Davis*, 906 F. Supp. 2d 545, 552 (S.D. W. Va. 2012) ("Central to the Court's analysis is the fact that Defendant's house is very small, consisting of a single-story four-square floor plan with a small bathroom and interior hallway. … a person could traverse the entire width or length of Defendant's house in seconds with just a few quick strides."); *see also United States v. Norman*, 638 F. App'x 934, 938 (11th Cir. 2016) (considering the small size of the house in determining whether a protective sweep was reasonable in scope.). "The safety of the officers, not the percentage of the home searched, is the relevant criterion." *Thomas*, 429 F.3d at 287.[5]

---

[5] While it seems defendant was not actually handcuffed until he crawled out of the den, this fact does not change the court's conclusion. The protective sweep was permissible even if defendant's arrest took place just outside of defendant's apartment rather than inside the dwelling. *See United States v. Lesane*, 685 F. App'x 705, 722 (11th Cir. 2017)("A protective sweep of a home is authorized, even where a suspect is apprehended outside of a house, so long as officers have reason to believe that there is someone inside the building who would still pose a danger to officers."). *See also Norman*, 638 F. App'x at 937-38 ("We have expanded the scope of a protective sweep to situations in which a defendant was arrested in a 'portion of a structure' outside the residence. … [T]he fact that defendant was arrested as she stepped outside the house did not prevent officers from conducting a protective sweep inside the home, provided the sweep was otherwise permissible."); *Yeary*, 740 F.3d at 579–80 (upholding protective sweep of home when deputies did not enter the home to make the arrest, but defendant instead cooperated, left the home and was arrested.); *United States v. Vazquez*, 406 F. App'x 430, 433 (11th Cir. 2010)("We have previously upheld protective sweeps of residences that stemmed from arrests made outside those residences."); *Tobin*, 923 F.2d at 1513 (permitting a protective sweep of a residence after an arrest in the garage); *United States v. Kimmons*, 965 F.2d 1001, 1009 (11th Cir.1992), *cert. granted* and *judgment vacated on other grounds, Small v. United States,* 508 U.S. 902, 113 S.Ct. 2326, 124 L.Ed.2d 239 (1993)(sweep of house proper after suspect ordered out and placed under arrest); *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983) ("Law enforcement officers who have lawfully apprehended a suspect on a portion of a structure (here it was an open porch built as a part of the home) which they have reason to believe contains dangerous third persons who might

Second, the officers had a reasonable belief, based on "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept [*i.e.*, the very small apartment] harbor[ed] an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334, 110 S.Ct. 1093. Specifically, even after defendant and the other two occupants were taken into custody, the officers saw blinds moving in the bedroom, a room into which they could not see from where they were standing. Therefore, their belief that another person could be in the apartment was entirely reasonable. Further, the officers suspected defendant of having been involved in dealing drugs and they themselves were arresting him for the crime of murder associated with a drug deal. *See United States v. Fields*, 178 Fed. Appx. 890, 893 (11th Cir. 2006)(quoting *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221 (11th Cir. 1993) (recognizing that drug dealing is known to be extremely violent)). *See United States v. Fields*, 178 F. App'x. 890, 893 (11th Cir. 2006)(quoting *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221 (11th Cir. 1993) (recognizing that drug dealing is known to be extremely violent)). Thus, the arrest team had a reasonable belief that at least one other individual was still in the apartment and that this individual might present a threat to ambush or otherwise harm law enforcement. *See Norman*, 638 F. App'x at 938 (fact that officers saw another woman inside the home – and also had reason to believe that defendant's boyfriend, who had a criminal record and was believed to be involved in a

---

pose a threat to their safety have a right to conduct a reasonable security check of such premises.")(citations omitted).

crime – could be inside and could fear arrest provided specific, articulable facts under which officers could reasonably justify a limited sweep in order to secure their safety); *United States v. Hollis*, 780 F.3d 1064, 1069 (11th Cir. 2015) (protective sweep "was a valid attempt to ensure that the apartment did not contain 'other persons who are dangerous and who could unexpectedly launch an attack'" where a rational inference could be drawn, based on drug activity, that there might be armed individuals inside the apartment.); *Yeary*, 740 F.3d at 580 (presence of two unknown individuals in the residence contributed to reasonable suspicion that deputies were in danger); *United States v. Hromada*, 49 F.3d 685, 690 (11th Cir. 1995) (reasonable belief that someone else could be inside the house permits a protective sweep); *United States v. Tobin,* 923 F.2d 1506, 1513 (11th Cir.) (en banc), *cert. denied,* 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991) (same). In addition, defendant does not contend that the sweep lasted longer than was necessary for officers to locate the unidentified person(s) in order to dispel their reasonable suspicion of danger, nor is there any indication from the evidence that it did.

The fact that the officers searched behind the refrigerator and that, during that search, the door to the freezer section opened, does not alter the court's conclusion. The relevant question is whether the space between a wall and a refrigerator that was situated at an angle, rather than flush against the wall – with one to one and half feet of space between the two, and nothing prohibiting someone from climbing on top of or getting behind the refrigerator – is an area that could have concealed a person under these or any circumstances. *See Buie,* 494 U.S. at 335-36, 110 S.Ct. 1093. The court is satisfied that, given the specific facts of this case, officers had a reasonable belief that a person could

have hidden in that space. Accordingly, it was reasonable for them to clear that area, and to move the refrigerator – thereby exposing the duffel bag – by pulling on the door handle in order to do so.

### c. *Inevitable discovery doctrine*

The court also finds that the inevitable discovery doctrine applies to this case. "Under the exception for 'inevitable discovery,' the government may introduce evidence that was obtained by an illegal search if the government can establish a 'reasonable probability that the evidence in question would have been discovered by lawful means.' *U.S. v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015)(quoting *Jefferson v. Fountain,* 382 F.3d 1286, 1296 (11th Cir. 2004)). The government must also establish that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." *Id.* (citing *Jefferson* at 1296). "'Active pursuit' does not require that police have already planned the particular search that would obtain the evidence. The government must instead establish that the police would have discovered the evidence 'by virtue of ordinary investigations of evidence or leads already in their possession.' [*United States v.*]*Virden,* 488 F.3d at 1323." *Johnson* at 1274.

In this case, the "investigation [into defendant's connection with the duffel bag containing marijuana and the drug deal and murder] was the 'lawful means which made the discovery inevitable.'" *Johnson* at 1275 (citing *Jefferson* at 1296). The "active pursuit" of the "ordinary investigation" of the evidence "already in [their] possession" – *i.e.*, what the officers had already learned from the eyewitnesses – would have led them to the duffel bag and marijuana hidden inside. *See id.* Moreover, Officer Saxon had already discussed

with Judge Kaminski the possibility of obtaining a search warrant for the apartment if, in fact, defendant were found there. The court agrees with the government that because "a refrigerator could contain such evidence, it would have been searched and the duffel bag would have undoubtedly been found." Doc. 54 at 5. Therefore, the court finds, in the alternative, that because the inevitable discovery doctrine applies, the motion to suppress is due to be denied.

For the reasons set forth above, to the extent defendant seeks to suppress the duffel bag and the marijuana found within, his motion is due to be denied.

## CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress (Doc. 43) be DENIED.  It is further

ORDERED that **on or before July 6, 2020**, the parties may file an objection to the Recommendation. Any objection filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party filing the objection objects.  Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file a written objection to the Magistrate Judge's findings and recommendations under 28 U.S.C. §636(b)(1) shall bar a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of a party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. 11th Cir. R. 3-1; *Resolution Trust Co. v.*

*Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885

F.2d 790, 794 (11th Cir. 1989).

DONE, on this the 23rd day of June, 2020.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge